This is a case where Ms. Fru Shure, an Anglophone Cameroonian woman, was caught in the middle of violence between Anglophone separatists and the brutal security forces of the Cameroonian government. She owned a small clothing store in an Anglophone region and was forced to close it by Anglophone separatists on Mondays, and as a result, the security forces determined that she was an Anglophone separatist sympathizer. They arrested her, beat her, detained her, sexually assaulted her, and tortured her by forcing her to dig a hole which she believed was her own grave. But the problem in this case is that that's what her testimony says, but the IJ didn't find her credible, and so I don't know that there's not much doubt in my mind that if he found her credible, this would be a case in which some relief were appropriate. Can you address the credibility finding? Of course, Your Honor. So a couple things. First, the issues in this case are very similar to the issues in Munya v. Garland, 11 F. 4th, 750. In that case, which also involved an Anglophone Cameroonian woman, similarly, the person was detained for being an Anglophone sympathizer, sexually assaulted, and in that case, the immigration judge, as in our case, honed in on a couple of minor discrepancies, cherry-picking the record to find that she was not credible. In the Munya case, those discrepancies involved her understanding of the length of time that she was detained in a car, as well as, similarly to our case, medical records, which were slightly different from her testimony. In our case, the immigration judge did not employ the totality of the circumstances test as required under Shrestha v. Holder. He honed in on two inconsistencies in the medical documentation to make a determination that she was not credible. Those two inconsistencies were, first, after she was bailed out of detention or bribed out of detention, she received medical care in a hotel room on the outskirts of Chihuahua. She provided medical corroboration of the medical treatment that she received in the form of a letter from the nurse who helped her and a doctor who helped her. Let me, I want to understand the sequence here correctly. Um, she testified that she was in captivity, if you will, from October 23rd through the 27th? For the, yes. Okay. The, the, she also testified that she received medical treatment on the 18th. Now, you understand you, you say that's a mistake. Right, so you're, she, she did not testify that she received medical treatment. Okay, what was it, what was the evidence? She testified that received medical treatment October 28th. Right, but there is evidence of medical treatment on the 18th. So the doctor's letter has the date October 18th. Okay, and your, your client says that's a mistake. It should have been the 28th. Correct, and the nurse's letter says that she was called upon to provide treatment, uh, in November. Okay, so let's focus on the first one for a second. We have a doctor's letter, and I agree, they're relatively minor descriptive. They're, they're not the world's most major, I guess is a better way to put it. So we have a doctor's letter that says, I treated her before the time that she claims she was in captivity, and, and, and she's claiming that he was treating her for the injuries that resulted from her captivity. So why isn't that a, First Your Honor, this court has held in Ijunji v. Holder 751 F31088 that a Scrivener's error should not be the death knell of a case. Well, what's, what evidence here is that there is a Scrivener's error? In other words, she says I was, I was treated after the time, right after the time I left captivity. The doctor's records or letter show that she was treated before. Um, she says that's wrong. The doctor must have written down the wrong date, but why, why can't the IJ say, well, we have a letter from a doctor that sort of is contrary to your claim? Well, because, under stress, the, the doctor, I'm sorry, the immigration judge was required to look at the totality of the circumstances. This was not medical treatment that was being provided in a hospital or even a medical facility. These were people who were being paid to treat a fugitive who was hiding out from the government. To me, that cuts the other way. It's like, you're right on, if you just hone in on this doctor's note, date could be wrong, but then if you look at the totality of circumstances, which I think the IJ and the BIA did, there's two other glaring issues with the nurse's testimony and the photos. So, why isn't that looking at the totality of circumstances saying that none of this is credible? Well, with, in terms of the, the nurse's letter, I mean, first, the immigration judge found that there was an inconsistency in that there were photos of her right leg and the narrative description from the medical professionals didn't explicitly mention her right leg. And I must say, I don't find the photos issue particularly inconsistent because the doctor says she's got injuries, all sorts of injuries, but the, the nurse's report. So, I mean, thank you, Your Honor, that's my argument. It's an omission, it's not an inconsistency. It's true in your client's testimony that I, I sought this treatment immediately after leaving captivity. I mean, again, Your Honor, I believe that it is, I mean, first, the judge asked, you know, gave Ms. Frewshore an opportunity to explain why, you know, why she thought that the records were incorrect. And she said, quote, in Cameroon, I'm sorry to say this, but they are not really effective like here in the United States. Records are not really kept like here in the United States. Things are different. And the immigration judge in this instance, as he did in other instances, engaged in conjecture using his own ideas about how records should be kept. Do you see the problem in that argument that basically you're saying Cameroonian records or medical records are not accurate, but, so we're supposed to take everything else in the record as accurate, but the date. Is that, is that your argument? Well, Your Honor, again, these records were, were prepared for someone who is seeking clandestine treatment in a hotel. But I guess my point being is you're asking us to pick and choose what's accurate in the medical record, correct? I'm saying that overall, given the circumstances, the medical records are remarkably consistent with her testimony. Except for dates. Except for the dates. I think the photos are a little more problematic. And I mean, Your Honor, in this case, you know, the immigration judge had a similar thought to you saying, well, if I'm going to prepare something, and I'm the medical professional in this case, and he says, talks about how he relies on his own notes being somebody who has a lot of cases. But even in this case, the immigration judge himself made a Scrivener's error. In the, in his decision at AR 214, he says that the, that the notice, that she entered the United States, that the notice to appear says she entered the United States on April 25th, 2019, when in fact, the notice to appear says she entered on March 27th, 2019. And that's what she testified to. My point just being, the fact that a date is wrong on a document doesn't mean that all of the information in the document is untrue. And in this case, throughout, the immigration judge took, seemed to approach this case from the position that she was being untruthful and cherry-picked and, and asked her abusive questions to, to try to get to belittle her. Can I ask a question that I'm not sure I can know the answer from, from the record? These medical records were produced when, in the proceedings? That is not clear from the testimony. Well, but, but I, I assume your client produced So my client was detained throughout the... Right, right, no, I understand. I assume they were introduced in your client's case. Yes, my, my client's attorney introduced them and it was... So that before she took the stand, did her attorney know the dates that were on these medical records? I was not the attorney below. No, I don't know. That's when I say you, I mean your side. Right. I mean, I will say the attorney, she was detained throughout the case and her attorney was located in a different state, so I'm not sure. Yeah, it just, it, it strikes me as, and maybe it cuts in her favor, I don't know, a little bit strange that she would be intentionally lying about dates that she knew about because the documents were in possession of her counsel. Exactly, your honor. And one of the, one of, one of the mistakes I would say that the immigration judge made here was focusing exclusively on these documents because all of the other of credibility were not called into question and, and in the cases that I'm posing counsel sites for other adverse credibility cases, there are often findings that the, that the respondent was not forthcoming, that they didn't testify with detail, that they contradicted themselves. And in this case, she was internally consistent through her direct, through the cross, through the immigration judge's extensive and often abusive questioning of her. She was consistent with her credible fear interview, her declaration. There were no, and the immigration judge didn't make any statement in his decision about any issues regarding her demeanor or her being forthcoming. And as I was saying before, in this case, the immigration judge actually asked more questions than even Ms. Fruchour's attorney. And many of those questions were, you know, to, to question Ms. Fruchour in language that seemed to be intended to undermine and belittle Ms. Fruchour. For example, in the most egregious example, Ms. Fruchour had testified that the military officers sexually assaulted her by vaginally penetrating her with their fingers. And the immigration judge pushed her on this issue saying, my question is this, that many women from Cameroon tell me of other abuses, that they have been raped by these men. Did that happen to you? To which she responded, they fingered me, that's a sign of rape as well. And while the judge admitted that that digital penetration would be a, quote, violation, he still continued with this line of questioning saying, quote, but I'm talking about a physical sexual intercourse. Did any of the men have the physical sexual intercourse? I mean, I know you're, you're unhappy with the tone of the questioning, but why isn't, why isn't the IJ there just doing what he's supposed to do, which is make sure the you say, a scared person testifying, and her case would be better. Well, you know, if, if, if more had occurred and he's trying to find out whether more. Well, I would assume that forcible penetration of a vagina, whether it's by a person's finger or. Well, but he doesn't say, what, he doesn't say that's not. But why does he, why does he continue with this questioning? Well, but I think there could be, what I'm suggesting is there could be an innocent, more innocent explanation, which is it's, we've often told IJs it's your job to make sure the record is complete. And if she was also assaulted in a different manner, that would be important to have in the record. Now, if the IJ had said at the end, well, all that happened is that you were digitally penetrated. This would be a, that would be a serious error, but he, he didn't, he said, I don't believe you, your, your testimony for these other reasons. So I'm, I'm just not sure it's fruitful to spend time questioning his motives on that question. Okay. Your Honor, but I would say, and again, looking at the Munoz case, where this court was mindful of the way that the immigration judge treated a person who testified about being sexually assaulted, that that's an inappropriate way to question someone who has just testified consistently with her written documentation that she was a victim of, of sexual assault. You wanted to save some time for rebuttal, but it's up to you, Judge Kuhl, before you sit down. Judge Kuhl, do you have any questions? I do not. Okay. I'll be ready. Good morning, Your Honors. May it please the court, Ashley Arthur on behalf of the Attorney General of the United States. One thing to keep in mind, Your Honors, is the petitioner had the opportunity to straighten out her story, but she made a strategic litigation decision through counsel twice to decline, redirect, or additional testimony. The IJ noted his concerns regarding her credibility on August 28, 2018. He granted a continuance for her to collect additional evidence, and then the parties reconvened almost a month later, and she again declined to give additional testimony. So what, in your view, should she have done? Should she have gone back to the medical professionals in Cameroon and asked them to correct the date? Your Honor, I believe once the IJ expressed his concerns and they had a whole month to reflect on what occurred and how to maybe steer the ship the other way in the favor of where they wanted to go, they should have sought more compelling persuasive evidence. Petitioner laments in her opening brief that her medical evidence is, quote, bare bones. I guess I'm asking a very specific question. It seems to me that if the medical professionals had come back and said, gee, she's right. The treatment was on October 28. We don't keep great compelling answer to the bases that the judge gave for the credibility determination, would it not? Respectfully, this case is not solely about dates. It's about the contents of our claimed injuries, not jiving with the record. Well, put aside that for a second. The judge does say I'm basing the credibility determination on three factors. Two of them are dates, correct? He bases it on dates and also the complete omission from all of her medical documentation as to her injury that she suggested was the most severe and bothering. I understand, and we're agreeing with each other. Two of the reasons he gives are dates, and the third is the absence of documentation as to the injuries. As to the first two, the dates, would they have been, would the judge's concern have been obviated? Had the medical professionals corrected the dates to correspond with Ms. Schur's testimony? The answer has got to be yes. I would assume yes. It's hard to say for sure if the fact finder would decide in that situation. So what I'm trying to find out, I thought these were the easy questions, and then I was going to ask you the hard one, but they've all turned out to be hard, is, is there any evidence in this record, and I didn't see it, at the time of the, after the continuance, if that counsel said, well, we're trying to get the records from these doctors, but it's been difficult, and they're on the way, or I need another month, or something like that. Yes, Your Honor, the petitioner indicated that she was having difficulty, I believe, with money resources to get these documents translated properly, but the IJ did grant a continuance for a whole month, and when she came back and the parties reconvened, the evidence remained underwhelming, and the judge, that she declined redirect examination or further additional testimony at all points, and even if the dates are a part of the IJ's bases, it's rightfully so, because if an applicant can't get the dates right, then none of the rest of her information is reliable. It contradicts her medical records, and in turn, that destroys the document's reliability, and when you also consider that these documents were presumably, especially the doctor's notes in particular, were presumably created somewhat contemporaneously with his examination, and were they created contemporaneously, or does the record lead me to at least the supposition that they were created in response to her request for testimony? We don't know, and that's one of the problems here, is we don't know how reliable this evidence is. Normally with medical professionals, she disclaims for the nurse in particular, she disclaims in her opening brief that the nurse's documentation was presented, she slaps this disclaimer on there saying the nurse's letter was not submitted in her capacity as a medical professional. I quote, it was clearly written not as a medical record, but as a corroborating statement as to the events leading to injury, end quote, and these are events the nurse did not witness, and so basically she's just writing down some stuff that she heard, and she can't corroborate events that she wasn't there for. Can you address the issue that Judge Blumenthal and I just briefly discussed, but didn't, wasn't much discussed in the, by the petitioner? There's a third reason, and that's the argument that the record doesn't corroborate her testimony about, now we're treating, contrary to what everybody's been saying, we're treating these records as reliable. What's missing from the records, or what's contradictory to her testimony? Yes, your honor, so she claimed there is this injury to her right leg that was so severe, it was still bothering her a year later. And counsel, counsel, Judge Gould, your voice got in and out because you may be leaning away from the microphone. The mics are very directional, so if you could, please. Yes, no, just talk louder. Yeah, talk louder is probably a better way to put it. I will talk louder, and I apologize if now I sound like I'm yelling. No, you only sound to you like you're yelling. You don't sound to us like you're yelling. So, as to the contents and the description that petitioner gave to her injuries, not jiving with medical records, she claimed that in the doctor's presence, the nurse took pictures only of her right leg. The doctor mentioned in his notes only a left leg injury, and yet this right leg injury was so severe that it was still bothering her a year later, and yet there was no mention of it anywhere in her medical documentation. She went so far as to submit photos of this supposed right leg injury, and as the IJ pointed out, the records, the photographs, quote, contain no authenticating marks or dates, nor is there enough context in the images to ascertain that she is even the person depicted in them, and this is not an obvious or trivial or minor inconsistency because, one, it's obvious, left versus right, but it's more than that. It's the claim severity going unnoted by these medical professionals, and the IJ rightly found that that was implausible. This is not simply an instance of a non-inclusion of an inessential fact. This is a severe injury that's completely omitted from her medical evidence, and the nurses... So I'm not sure you're allowed... Did the IJ ask to show the leg at the hearing? I'm not sure she's allowed to do... The IJ's allowed to do that, but was that at all addressed? He did not ask a petitioner to disrobe, which may have led to a problematic scenario, considering she was claiming sexual assault, and asking a sexual assault victim to disrobe may not be appropriate. What do you do with the report medical report that she had suffered multiple bodily confusions? Does the IJ have to say on both her left and right side? The IJ, the doctor. I think that if one has an injury that is so severe, and she indicates it's the most severe of all of her injuries, and it's bothering her a year later, that that is significant, especially when the nurse's declaration also states that she treated petitioner, and she fully recovered barely in a week. That also does not corroborate such a severe injury that would last nearly a year later, and that's why this is not just a non-inclusion of an inessential fact, and the records not matching her description of her injury is significant. If she had admitted her story to match the medical records, it might be different, but she insisted her story was correct, and continued to contradict her own evidence, which is how this case is distinguishable from Mounier, because in Mounier, the petitioner claimed she misremembered, and it was due to trauma. Here, a petitioner never claimed trauma or any other competency issue. She has insisted she was initially didn't have any explanation for these discrepancies, and when pressed, she finally settled on, quote, we're all human beings. Well, here we have three human beings giving three different accounts of when she received treatment, what injuries she sustained, and what treatment she received, and so going off that logic, why would her account be any more credible than the doctor or the nurse, and under the Watershed Real ID Act, there's no presumption an applicant is human. As for her new assertions in her opening brief, that she contends that the medical evidence she submitted is, quote, bare bones, and that the doctor's note is, quote, only a 63-word letter, the government did not submit this bare-boned evidence, and the government did not force her to submit it either. She chose to proffer this evidence, saying, look at this evidence, it supports my claim, and no reasonable fact finder would be compelled to reverse the agency based on her own assessment of her own evidence that she chose to submit, and then declined additional testimony, additional redirect twice. It's also purely speculation that, oh, well, the doctor was overlooked, and that's why he omitted the details of the severity or the dates. That's not in the record, that's attorney argument, which is not evidence, and... Can you address the motion to reopen? On changed country conditions, yes. Yes, Your Honor. And my time is three minutes. Okay, so the board did not abuse its discretion here, because petitioner's remand motion, notably why she did not ask the board to reconsider the adverse credibility determination in her remand motion, was based solely on changed country conditions, and the board properly found that there was no material change in the country conditions. It had only been a year between her hearing and her appeal, and within that year, her evidence just demonstrated this persistence of a poor and unstable sociopolitical environment. Well, the evidence, I take it, what the board was saying was there may have been persecution against anglophones in Cameroon at the time you claim of this incident, but it hasn't changed. It hasn't gotten worse. It's just as bad as it used to be. Conditions that existed at the time of her original hearing, and so for a motion to remand to prevail on changed country conditions, they must demonstrate a material change in country conditions. Would it matter, I guess, if the denial is based on an absence of credibility? I suppose you could have changed country conditions that exposed you to new threats of persecution, so the first holding doesn't preclude reopening, does it? I'm sorry, could you repeat that? The denial of relief based on a credibility determination wouldn't preclude reopening based on changed country conditions, would it? I guess it would depend on the type of case. Here, the environment in Cameroon, there's obviously, it's not an ideal situation for anglophones, but because there is an adverse credibility determination here, that means nothing she claimed in connection for her taken as true, including harm based on her political opinion or anglophone identity. It's all called into question because we just don't know what's true, and I just would like to remind the court that adverse credibility does not require an agency to enter a finding of fabrication, although sometimes it does, and we shouldn't equate adverse credibility findings with findings of untruthfulness. This is a scenario where we're looking to whether the record compels reversal of the agency's decision, a reasonable fact finder, and that's what the let the IJ act like a fact finder, much like a district court judge or a jury, and this is what fact finders do. They assess claims for reliability. They ask, do I find this claim reliability? And here, the answer is no, even based on her own assessment of her evidence, that it's bare bones and a 63-word letter, and she was given the opportunity twice to not, you know, day one and day two were close together. It was almost a month to think and reflect and try to build a stronger, more persuasive case, and she declined to do so, and if the court has no further questions. Counsel, I have a question for you. Am I correct that we review the adverse credibility determination for clear air in the same way we would review actual findings for clear air? The standard for review for credibility would have to agree with this determination, or as this court has just said, under the most extraordinary circumstances. If there's no further questions, we ask the court to deny the petition. Thank you. Thank you. A couple of points in rebuttal. First, it's true that at the end of the first part of the individual hearing, the immigration judge identified several documents that he would want to see. Those included proof that she owned a store, proof that her uncle had been killed, and then a translation of the documents, the medical documents from French into English, and she provided all of those things, and the judge did not comment on the corroboration that she provided that he had asked for. Was there proof that the uncle was killed, or I think there was proof that he died? There's a death certificate. Yeah, I don't know. The cause of death is not on the death certificate. Okay, that's correct. In terms of the remand question, at AR 229, the agency did acknowledge that she is anglophone, so I think for that basis alone, the agency should have granted remand based on the new evidence. What was the new evidence? The evidence was, the agency's description of it was, if I can recall, it's as bad now as it was different, but in two months after her hearing, there were local elections which caused the anglophone separatists to escalate the harm, and that was, there was an Amnesty International report about that, and the Center for Holocaust Studies, sorry, the Holocaust Memorial Museum also provided a document that said that Cameroon was ranked ninth in the world of countries at risk for mass killings with civilians in anglophone countries. I'm asking a specific question. Are you contending that the agency was wrong, and I forgot what the standard of review is for a second, was wrong in saying that the situation hasn't changed materially in the last year? I think nobody contests that Cameroon is a terrible place for anglophones. The question is for the motion to reopen whether or not you've shown country conditions have materially changed since the hearing. Yeah, the BIA found that there were only incremental worsening, and I believe that there actually was a substantial worsening so that it was an abuse of discretion. Tell me where on the record it shows substantial worsening. Well, again, the documents, this Amnesty International report that talks about how the separatists escalated their fight following local elections and this documentation from the Holocaust Memorial Museum, which said that their anglophones were now at immediate risk of mass atrocities. Thank you. We've taken you over a little bit, but we appreciate the arguments on both sides and the briefing on both sides in this case will be submitted. We will be in recess until Friday. All right.
judges: GOULD, HURWITZ, BUMATAY